IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

NDIDI NWAGBO,

    Defendant.

CASE 1:19-CR-0223-WMR-LTW-1

## FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This matter is presently before the Court on two Motions to suppress filed by Defendant Ndidi Nwagbo ("Defendant"). In the first, Defendant seeks to suppress in-court identifications based on suggestive out-of-court identification procedures. [Doc. 53]. In the second, Defendant seeks to suppress certain statements he made to law enforcement after his arrest. [Doc. 54]. On January 9, 2020, the undersigned held a hearing regarding the motions. [Doc. 68]; see also [Doc. 69]. Defendant filed his post-hearing brief in support of the Motions ([Doc. 73]), the Government filed its Response in opposition ([Doc. 81]), and Defendant filed his Reply. ([Doc. 87]). The matter is now ripe for consideration, and for the reasons outlined below the Court **RECOMMENDS** that the first Motion to Suppress ([Doc. 53]) be **GRANTED in part and DENIED in part** and that the second Motion to Suppress ([Doc. 54]) be **DENIED**.

# BACKGROUND

The Indictment charges Defendant with two counts of aiding and abetting the making of fictitious statements to a licensed firearms dealer.  [Doc. 9].  In his first Motion to Suppress, Defendant argues photographs of Defendant that were shown to two eyewitnesses were "unduly suggestive" and as such he moves to suppress any in-court identification by those witnesses.  [Doc. 52].  In the second Motion to Suppress, Defendant moves to suppress his statements to law enforcement.  [Doc. 53].  The Court held a hearing on both Motions, in compliance with Jackson-Denno,[1] and the following factual background is drawn from the evidence presented at that hearing.  See [Doc. 69].

## A.   Preliminary Investigation

In May 2019, an agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") was contacted by an employee at a pawn shop.  [Doc. 69 ("Tr.") at 6–8].  The employee informed the ATF agent that co-Defendant De'Aaris Markel Nelloms—along with two other individuals—tried to purchase five .380 caliber pistols, but that he received a "delayed" status.  [Id. at 6].  A few days later, Nelloms's

---

[1]  Jackson v. Denno, 378 U.S. 368 (1964).

background check cleared, and the pawn shop employee again contacted the ATF agent.  [Id. at 6–7].  ATF agents surveilled the pawn shop and saw Nelloms arrive with two other people, one of whom was later identified as co-Defendant Zane Michael Fields.  [Id. at 7–9].  Nelloms bought the five pistols, left, and was followed by the ATF agents.  [Id. at 7–8].  Nelloms, Fields, and the third individual proceeded to another gun store where they purchased another five firearms.  See [id. at 8].

Nelloms then drove to the home of Fields, where the trio unloaded the ten guns they had purchased.  [Id. at 8–9].  Later that day, Nelloms left the residence without the guns, and ATF agents approached Nelloms to speak with him.  [Id. at 9–10].  Nelloms admitted the firearms were not for him.  [Id. at 10].  Instead, Nelloms bought the firearms for Fields and was told a "guy," later identified as Defendant, would pay Nelloms for making the purchases.  [Id. at 71–72].  The ATF agents then spoke with Fields, who corroborated Nelloms statements.  [Id. at 15, 56–57, 72].  Fields said he, Nelloms, and Defendant went to the stores to purchase firearms and that the plan was to give the firearms to Defendant for money.  [Id. at 15, 72].  Fields gave consent to search his bedroom where the agents then found the ten firearms purchased that day.  [Id. at 59].

### B.   Eyewitness Identifications of Defendant

Fields then contacted Defendant while monitored by ATF agents. [Id. at 16].  Defendant instructed Fields to mail the firearms to a man named Scott Dickerson ("Mr. Dickerson") in New York. [Id.].  The ATF agents had postal inspectors generate tracking numbers to make it seem as though the firearms were being mailed to New York, and the agents then transported the firearms and delivered them to Dickerson's home. [Id. at 16–18].  Mr. Dickerson's wife, Robbie Ann Weeks ("Ms. Weeks"), arrived home and took the packages inside. [Id. at 18].  The ATF agents then came to the door with a search warrant authorizing a search of the home. [Id.].  The agents spoke with Ms. Weeks and asked her if she knew anyone associated with her husband who went by the nickname "D." [Id. at 18–19].  Ms. Weeks said she did and described "D" as a heavy-set or muscular black male. [Id. at 62].

Using his cellular phone, ATF Special Agent Gary D. Dorman then showed Weeks a photograph of Defendant, obscuring any personal information identifying Defendant by name. [Id. at 19-20].  Without hesitating or indicating she was unsure, Ms. Weeks identified the photograph as "D." [Id. at 20].  Ms. Weeks told agents that she met "D" about a year earlier and that she used to work for a company owned by him and/or his sister. [Id. at 21]; see also [id. at 63–64, 91].  Ms. Weeks stopped

working for the company a few months prior and she stated that Defendant owed her money.  [Id. at 21].  Ms. Weeks also told agents that Defendant had previously dropped off guns at her home.  [Id. at 60].

The agents separately spoke with Mr. Dickerson, who confirmed that he had received packages of firearms from Defendant.  [Id. at 26].  Dickerson told the agents that he recruited his daughter, Catlin Dickerson ("Ms. Dickerson"), to purchase firearms for Defendant at a gun show in Mississippi.  [Id. at 34–35].  Based on this information, ATF Special Agent Emily Norris and Agent Dorman interviewed Ms. Dickerson in the presence of her counsel.  [Id. at 30].  Ms. Dickerson stated that several months prior to May 2019, she received a phone call from her father during which he said he was going to be attending a gun show in the town where Ms. Dickerson lived.  See [id. at 35–36].  Ms. Dickerson agreed to go to the gun show with her father, and after the first day of the gun show Mr. Dickerson introduced Defendant to her as "Big D."  [Id. 36–38].  Ms. Dickerson described Defendant as a muscular-looking black male with a beard.  [Id. at 67].  Ms. Dickerson, her father, and Defendant all shared a hotel room that evening, and Defendant stayed in the hotel room all night.  [Id. at 38, 48].

The next day, Ms. Dickerson, her father, Defendant, and Ms. Dickerson's sibling attended the second day of the gun show together. [Id. at 38]. Before entering, Defendant gave Ms. Dickerson $1,000 in cash. [Id. at 37, 47–48]. Ms. Dickerson then shopped for firearms with Defendant, and Defendant gave Ms. Dickerson non-verbal cues indicating which firearms she should buy. [Id. at 37]. During their interview of Ms. Dickerson, the agents showed her a six-person photographic lineup. [Id. at 30]. The photographic lineup was prepared by an intel representative who found other individuals that have similar traits to Defendant and then randomly arranged the photographs. [Id. at 30–31]. The lineup was introduced during the hearing as the Government's Exhibit F and has been viewed by the undersigned.

Before showing Ms. Dickerson the photographic lineup, Agent Norris told her that "there may or may not be a person [she] recognizes in the photographic line-up." [Id. at 32]. Agent Norris presented the lineup to Ms. Dickerson, and the agents did not point or indicate which photograph Ms. Dickerson should choose, nor did they threaten her or make her any promises. [Id. at 33–34]. Ms. Dickerson looked at the photographic lineup and, without hesitating, identified Defendant as "Big 'D,'" circling his photograph and putting her initials next to it. [Id. at 34]. Ms. Dickerson did not

identify any other picture as Defendant. [Id.].  The same lineup was also shown to another individual who was unable to identify Defendant's photograph. [Id. at 67–68].

### C.   Defendant's Statements to Law Enforcement

On May 24, 2019, ATF Special Agent Timothy Fudella was tasked with watching for Defendant to leave an apartment complex. [Id. at 82].  Agent Fudella was given a photograph of Defendant and told the investigation originated in Atlanta and involved firearms. [Id. at 83–84].  When Defendant exited the apartment complex, he was approached by law enforcement and placed in handcuffs. [Id. at 83–85].  Before being placed in Agent Fudella's vehicle, Defendant asked agents "about what was going on," prompting Agent Fudella to read Defendant a Miranda[2] warning using a pre-printed card. [Id. at 85–86].  Defendant said he understood his rights and that he was willing to talk to law enforcement, but he further said "he didn't want to talk too much about the case." [Id. at 87].

Defendant was placed inside Agent Fudella's vehicle to be transported to the ATF's Buffalo, NY offices. [Id. at 88].  During the approximately 30-minute drive, Defendant was still "curious about what was going on." [Id. at 90].  The agents

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

explained that they "didn't know much" because they "weren't the agents in the case." [Id.]. One of the agents explained the case "involved firearms out of Atlanta" and told Defendant he was being taken to the Buffalo offices where "the people who knew more about the case would . . . have more questions for him." [Id.]. Defendant responded, "That sounds pretty serious" and asked for additional details, but the agents "explained to him that [they] didn't have any other details." [Id. at 96–97]. Defendant also discussed "why he was leaving his mother's house" at the moment of his arrest, stating that "he received a phone call and he was going to help a friend," but Defendant then specifically stated that he did not "want to say any more than that." [Id. at 96].

Otherwise, Defendant and the agents engaged "in casual conversation," talking about Defendant's child and his business and joking about exercise. [Id. at 90–92]. Defendant "mentioned he liked to travel" and said he "had recently been in Atlanta." [Id. at 90]. Defendant never told Agent Fudella he wished to have an attorney or wished to invoke his right to silence, and the agents did not make any threats or promises to Defendant. [Id. at 91–93]. After arriving at the ATF's Buffalo offices, the agents put Defendant in a secure room and got him water and cookies. [Id. at 92].

A short time later, Agent Dorman and Agent Norris went to interview Defendant. [Id. at 23]. The agents did not speak with Agent Fudella prior to

8

questioning Defendant, and Agent Dorman admitted that he did not know that Agent Fudella had already read Defendant a <u>Miranda</u> warning.  [<u>Id.</u> at 70-71, 92].

Agent Dorman and Agent Norris first asked Defendant questions regarding his name, date of birth, his citizenship, where he was born, and his occupation.  [<u>Id.</u> at 25, 51–53].  While most of the questions were biographical details for a standard book-in form, Agent Dorman admitted that his questions regarding Defendant's ownership of a business involved details beyond "what the book-in form calls for."  [<u>Id.</u> at 51–53].  However, Agent Dorman also testified that his questions were to "make sure we're dealing with the right human being."  [<u>Id.</u> at 25].  Agent Norris then read Defendant a second <u>Miranda</u> warning, and Defendant then said "he didn't wish to continue without counsel."  [<u>Id.</u> at 25-26].  After that, Agent Dorman asked Defendant if he had "any questions not case related" and concluded the interview.  <u>See</u> [<u>id.</u> at 53–54].

## **DEFENDANT'S MOTIONS TO SUPPRESS**

As mentioned above, Defendant moves to suppress Ms. Weeks and Ms. Dickerson's identifications ([Doc. 52]) and his own statements to law enforcement ([Doc. 53]).  The Court addresses each of the motions in turn.

### A.   <u>Motion to Suppress Eyewitness Testimony</u>

Defendant contends that showing Ms. Weeks only a single photograph was unduly suggestive, especially when there was no emergency and the agent failed to warn Ms. Weeks that the photograph might not be of an individual she recognized. [Doc. 73 at 14–15]. Further, Defendant argues, the circumstances present a substantial likelihood of misidentification because Ms. Weeks had little opportunity to view Defendant prior to being shown the photograph. [Id. at 15–16]. As for the identification by Ms. Dickerson, Defendant contends that it too was unduly suggestive because he believes that his photograph "stood out in a number of ways." [Id. at 16–17]. Defendant also asserts that there is a substantial likelihood of misidentification by Ms. Dickerson because her single interaction with Defendant had occurred several months prior to her interview. [Id. at 17–18].

The Government responds that Ms. Weeks was not unduly influenced by the single photograph because: (1) she accurately described Defendant before being shown any photograph; (2) her identification was unequivocal and without hesitation; and (3) Ms. Weeks personally knew Defendant and had seen him in a non-criminal context before identifying him. [Doc. 81 at 14–15]. The Government further argues the six-person photographic line-up shown to Ms. Dickerson was not unduly suggestive and

that Ms. Dickerson had multiple opportunities to observe Defendant before being shown the line-up.  [Id. at 15–16].

In reply, Defendant argues Ms. Weeks's description of Defendant was "exceedingly generic" and that her opportunity to observe Defendant in a non-criminal context was not sufficient to render her identification reliable.  [Doc. 87 at 1–3].  Defendant also contends that the photographs in the line-up shown to Ms. Dickerson "did not 'resemble'" him, that her description was also "vague," and that the agents gave Ms. Dickerson only "a standard disclaimer that may have included a warning that appearances change and she may or may not recognize anyone."  [Id. at 3–4].

### 1.  *Legal Standard*

A criminal defendant is entitled to the exclusion of evidence if that evidence "is so extremely unfair that its admission violates fundamental conceptions of justice."  Dowling v. United States, 493 U.S. 342, 352 (1990).  Otherwise, the solution to "evidence of questionable reliability" is not "prohibiting introduction of the evidence, but [rather] affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit."  Perry v. New Hampshire, 565 U.S. 228, 237 (2012).

11

Regarding witness identification testimony in particular, the Supreme Court has developed a two-step test for determining whether an out-of-court identification based on a lineup or photo array is so unreliable as to violate due process. Manson v. Brathwaite, 432 U.S. 98, 107 (1977). First, the defendant bears the burden to show that the out-of-court photo identification procedures used were unduly suggestive. Williams v. Weldon, 826 F.2d 1018, 1021 (11th Cir. 1987). If they were, the Government bears the burden of demonstrating that, under the totality of the circumstances, the identification does not create a substantial risk of misidentification. Neil v. Biggers, 409 U.S. 188, 196 (1973); see also United States v. Wade, 388 U.S. 218, 240 (1967).

In assessing if there is a substantial risk of misidentification, the court assesses a variety of factors such as the opportunity the witness had to view the criminal, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness, and the length of time between the crime and the identification. United States v. Whatley, 719 F.3d 1206, 1214 (11th Cir. 2013); see also Manson, 432 U.S. at 116 (noting that the witness had the opportunity to "view the photograph at his leisure" and that the witness "examined the photograph alone, [meaning] there was no coercive pressure to make an

identification arising from the presence of another"). A subsequent in-court identification will only be suppressed if there is a "very substantial likelihood of irreparable misidentification." Manson, 432 U.S. at 116; see also Simmons v. United States, 390 U.S. 377, 384 (1968) ("The primary evil to be avoided is the substantial likelihood of irreparable mistaken identification."). If a witness's identification testimony simply "has some questionable feature," courts "rely upon the good sense and judgment of American juries" to decide what weight to give such evidence. Manson, 432 U.S. at 116.

### 2. *Ms. Weeks's Identification of Defendant*

The Court concludes that the single photograph shown to Ms. Weeks was unduly suggestive. Indeed, in support of the procedure, the Government simply notes that the agent "covered any personal identifying information on the photograph" and did not tell Ms. Weeks "that the person in the photograph committed a crime." [Doc. 81 at 14]. To be sure, providing Defendant's personal information alongside the photograph or telling Ms. Weeks that the person in the photograph was the suspect would have made the procedure even *more* suggestive. But the fact that Agent Dorman did not do those things does not make the single-photograph display itself any less unduly suggestive. Well-established precedent has made it abundantly clear that such a

13

procedure "is one of the most suggestive methods of identification and is always to be viewed with suspicion." Hudson v. Blackburn, 601 F.2d 785, 788 (5th Cir. 1979); United States v. Cueto, 611 F.2d 1056, 1063 (5th Cir. 1980) (procedure unduly suggestive where witness was shown one photograph of the defendant).

Having decided that the single-photograph display was an unduly suggestive procedure, the Court turns to the question of whether there is a "very substantial likelihood of irreparable misidentification." Manson, 432 U.S. at 116. Weighing in favor of the Government's position are the facts that: (1) Ms. Weeks gave a description of "D" that matched Defendant prior to being shown a picture; (2) Ms. Weeks did not hesitate or equivocate in her identification (3) Ms. Weeks had met "D" at least once before; (4) Ms. Weeks worked for a company seemingly affiliated with Defendant; and (5) Ms. Weeks stated that Defendant owed her money. [Doc. 81 at 14-15]. But, considering the totality of the circumstances, the Court concludes that the Government has failed to carry its burden and that Ms. Weeks's identification should be suppressed.

The fact that Ms. Weeks was able to describe Defendant prior to being shown a picture is indicative of reliability but is not enough on its own given that Ms. Weeks's description was vague, describing "D" simply as a heavy-set or muscular black male. [Tr. at 19, 62]. Likewise, the fact that Ms. Weeks did not hesitate in her

identification would suggest reliability but is heavily undermined by the circumstances.  See [id. at 20].  Ms. Weeks was not simply a bystander eyewitness, but rather picked up the boxes of firearms law enforcement was surveilling and took them into her home.  See [id. at 18].  Once she did, Ms. Weeks was presented with a search warrant and immediately interrogated by law enforcement, giving her a strong incentive to cooperate.  See [id.]; cf. Manson, 432 U.S. at 116 (finding an identification reliable where the witness had the opportunity to "view the photograph at his leisure" and "examined the photograph alone, [meaning] there was no coercive pressure to make an identification arising from the presence of another").  Under the circumstances, it is not surprising that Ms. Weeks identified the single picture she was shown as the individual the agent had just been asking about.  Ms. Weeks may have simply been parroting back the information she believed law enforcement wanted to hear.

Otherwise, the Government relies on the fact that Ms. Weeks met Defendant in a non-criminal context and "worked for one of his businesses" to argue her identification is reliable.  [Doc. 81 at 14-15].  But the factual record is not clear enough on these points for the Government to carry its burden "by clear and convincing evidence."  Wade, 388 U.S. at 240.  While Ms. Weeks stated that she met Defendant

at least one time approximately a year before her interview, there is no evidence regarding how long her opportunity to meet him was, the degree of attention Ms. Weeks paid to Defendant's appearance, etc. See Whatley, 719 F.3d at 1214.  Other than this one encounter, there is no clear evidence that Ms. Weeks ever saw Defendant or "D" any other time.  See [Tr. at 65].  Ms. Weeks stated that Defendant dropped guns off at her home before, but the agent could not recall if Ms. Weeks actually saw Defendant or simply was told that he had dropped off the bag.  [Id. at 60].

And while the Government asserts that Ms. Weeks "worked for one of [Defendant's] businesses," the evidence on this point is not clear either.  See [Doc. 81 at 14–15].  Agent Dorman's contemporaneous report of the interview states that Ms. Weeks "stated that she worked for [Defendant's] *sister*."  [Tr. at 64] (emphasis added).  Agent Fudella's testimony seems to explain this apparent contradiction because he states that Defendant told him the business was owned by "[Defendant] *and* . . . his sister."  [Id. at 91] (emphasis added).  Even allowing that Ms. Weeks worked for a business partially owned by Defendant, there is no evidence that this relationship involved any direct interaction between the two.  As Agent Dorman admitted, he had no idea if "Ms. Weeks had actually laid eyes on the Defendant" any time other than during her initial introduction approximately a year before the

interview.  [Id. at 65].  Although Ms. Weeks stated that Defendant owed her money, the weight this fact carries is severely undermined by the lack of any evidence she actually saw Defendant more than once.  See [id. at 21].

In sum, what the Government has shown by clear and convincing evidence is that under unknown circumstances, Ms. Weeks met a heavy-set or muscular black male she knew as "D" approximately a year before her interview.  [Tr. at 62–66].  For some months thereafter, she worked for a company that was perhaps owned in part by "D," but there is no clear evidence she ever saw "D" again.  See [id. at 21, 64–66, 91].  After being presented with a search warrant and interrogated by law enforcement about "D," Ms. Weeks was shown a single photograph that she promptly identified as "D."  [Id. at 18–20].  Under well-established precedent, this method was impermissibly suggestive.  See Cueto, 611 F.2d at 1063.  Under the totality of the circumstances, the Court concludes that the Government has not met its burden of showing there is not a "very substantial likelihood of irreparable misidentification."  See Manson, 432 U.S. at 116.  As such, the undersigned **RECOMMENDS** that the out-of-court identification by Ms. Weeks be suppressed and that any in-court identification be excluded as well.

### 3. *Ms. Dickerson's Identification of Defendant*

The identification by Ms. Dickerson, in contrast, stands on much surer

footing.  Defendant argues his "photograph was different than all five others" but the Court is not persuaded.  See [Doc. 73 at 16].  Unless the photographs are of identical twins with the same clothes and grooming habits and taken with identical backgrounds and identical lighting conditions, the photographs will be "different."  The photographs chosen for an "array do not need to be precise matches" to "avoid being unduly suggestive."  United States v. Hood, No. 1:17-cr-421-SCJ-LTW, 2018 WL 7286179, at *8 (N.D. Ga. Oct. 25, 2018), report and recommendation adopted, 2019 WL 169144 (N.D. Ga. Jan. 11, 2019).  Instead, Eleventh Circuit precedent makes clear that the people in the chosen photographs need only have "roughly the same characteristics and features as the accused."  Williams, 826 F.2d at 1021 (finding a lineup not impermissibly suggestive even though the defendant "was the only black man in the lineup").

Having reviewed the photographic lineup—Government's Exhibit F—the undersigned concludes that all the individuals in the photographs have "roughly the same characteristics and features as the accused" and that the lineup is thus not unduly suggestive.  See Williams, 826 F.2d at 1021.  First and foremost, all the other individuals are of the same race as Defendant, and four of the five have roughly the same skin-tone as Defendant.  At least three of the other individuals have facial hair

that is roughly similar to Defendant's facial hair.  While Defendant characterizes his hair style as uniquely "pointy," other individuals in the lineup have roughly the same hair style.  See [Tr. at 43–44].  Defendant's clothes are different from the other individuals, but he hardly stands out in this regard.  Several other individuals in the lineup are also wearing "unique" clothing, meaning that no one really stands out from the others.  Last, Defendant notes that the background of his photograph is lighter than the background in some of the other pictures.  See [Doc. 73 at 7].  But the background for Defendant's photograph is virtually identical to the one in the photograph immediately to the left of his.  In short, Defendant's photograph simply does not stand out in any noticeable way.  All the pictures have "roughly the same characteristics and features," and as such the lineup is thus not unduly suggestive.  See Williams, 826 F.2d at 1021.

Nor was anything else about the identification process unduly suggestive either.  Defendant contends that the ATF agents failed to show the images to Ms. Dickerson one at a time and that he did not "document the identification either by video or audio recordings." [Doc. 73 at 16].  But Defendant cites, and the Court has found, no authority holding that such failings render the identification procedures unduly suggestive.  See [id. at 16–17].  The Court concludes that the procedure used

19

here was not.  As discussed above, the array contained individuals with "roughly the same characteristics and features as the accused."  See Williams, 826 F.2d at 1021.  In presenting the lineup to Ms. Dickerson, the agents made clear that the lineup "may not . . . have a person [she] recognize[d]," and they presented the lineup without indicating who Ms. Dickerson should pick or making any promises or threats to her.  [Tr. at 33–34].  Because Defendant has not shown that the out-of-court photo identification procedures used were unduly suggestive, Ms. Dickerson's identification should not be suppressed.

Even if Defendant had shown the procedures were unduly suggestive, the undersigned would still recommend not suppressing Ms. Dickerson's identification because the Government has shown, by clear and convincing evidence, that there is not a "very substantial likelihood of irreparable misidentification."  See Manson, 432 U.S. at 116.  Ms. Dickerson spent an entire night in a hotel room with Defendant just a few months before her interview.   [Tr. 36–38, 48].  The next day, Defendant gave Ms. Dickerson $1,000 in cash and non-verbally cued her in as to which firearms to buy for him.  [Id. at 37, 47].  Those interactions were relatively recent and provided Ms. Dickerson ample opportunity to view and remember Defendant.  Being handed $1,000 in cash in a parking lot is not an incident one easily forgets.  Furthermore,

Ms. Dickerson accurately, if vaguely, described Defendant prior to being shown the lineup ([id. at 67]) she did not equivocate or hesitate in selecting Defendant from the lineup.  [Id. at 34].  Under the totality of the circumstances, the Court would find her identification reliable even if the procedures used were unduly suggestive, which as discussed above they were not.  For the foregoing reasons, the undersigned **RECOMMENDS** that Ms. Dickerson's identification not be suppressed.

### B.    Motion to Suppress Defendant's Statements

Miranda protects a defendant's "Fifth Amendment privilege against self-incrimination by requiring law enforcement authorities to advise a [defendant] subject to custodial interrogation of certain rights."  United States v. Bernal-Benitez, 594 F.3d 1303, 1318 (11th Cir. 2010); see also United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) ("Miranda 'warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'") (quoting Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).  The parties do not dispute that Defendant was "in custody" once he was arrested to be transported to the ATF's Buffalo offices.  Nor do the parties dispute that Defendant was subject to "interrogation" or its functional equivalent both during the car ride to the Buffalo offices and after his arrival at the offices.  But the record is clear

that Defendant *was* read a proper <u>Miranda</u> warning prior to being placed in the car for transport to the Buffalo offices.

Because Plaintiff was read a proper <u>Miranda</u> warning prior to any custodial interrogation, the question is whether Defendant knowingly and intelligently waived his rights by speaking with law enforcement.  <u>See</u> <u>United States v. Jones</u>, 32 F.3d 1512, 1516 (11th Cir. 1994).[3]  To the extent Defendant wished to invoke any of his rights "to cut off questioning," he needed to articulate that desire "with sufficient clarity that a reasonable police officer in the circumstances would understand the [Defendant's] statement to be an assertion of the right."  <u>Coleman v. Singletary</u>, 30 F.3d 1420, 1424 (11th Cir. 1994).  This is an objective inquiry that must be assessed on "a case-by-case

---

[3] The Government also bears the burden of showing Defendant's statements were voluntary.  <u>See</u> <u>Jones</u>, 32 F.3d at 1516.  This is a separate inquiry that turns on whether "the circumstances show that 'coercive police activity' overcame the defendant's free will."  <u>Arvelo v. Sec'y, Fla. Dep't of Corr.</u>, 687 F. App'x 901, 904 (11th Cir. 2017) (quoting <u>Colorado v. Connelly</u>, 479 U.S. 157, 163–64 (1986)); <u>see also</u> <u>Jarrell v. Balkcom</u>, 735 F.2d 1242, 1252 (11th Cir. 1984) ("[E]ven if a court finds compliance with <u>Miranda</u>, the court must still rule on the confession's voluntariness.").  Nowhere does Defendant argue he was subject to coercive police conduct that overcame his free will and rendered his statements involuntary.  [Docs. 73, 87].  For the reasons given by the Government in its response brief, the undersigned concludes that Defendant's statements were voluntarily made.  <u>See</u> [Doc. 81 at 17-18].

analysis." Christopher v. Florida, 824 F.2d 836, 840 (11th Cir. 1987); Medina v. Singletary, 59 F.3d 1095, 1101 (11th Cir. 1995).

The below discussion regarding Defendant's Motion to Suppress his statements is in two parts: (1) the statements Defendant made to law enforcement during the car ride to the ATF's Buffalo offices, and (2) the statements he made to Agents Dorman and Norris after his arrival at the Buffalo offices.

### 1.   *Defendant's Statements During the Transport*

Defendant's Motion to Suppress his statements made while being transported to the Buffalo offices is, at its core, based on a false premise.  Defendant contends "he invoked" his right to remain silent after being read the Miranda warning.  [Doc. 73 at 19].  But what Defendant actually said was that "he didn't want to talk too much about the case."  [Tr. at 87].  When a suspect makes a statement "that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right," Miranda and its progeny "do not require the cessation of questioning."  Davis v. United States, 512 U.S. 452, 459 (1994); see also Berghuis v. Thompkins, 560 U.S. 370, 380–82 (2010) (applying Davis to a defendant's alleged invocation of his right to remain silent).

Defendant's admonition that "he didn't want to talk too much" was just such an ambiguous statement. <u>See</u> [Tr. at 87]. Only Defendant could possibly know what he considered "too much." All law enforcement knew was that Defendant was willing to speak with them about the case; Defendant alone had the ability to decide when he believed the discussion was "too much." As Task Force Officer Joesph Palermo testified, at no point after making that initial statement did Defendant tell the officers "he no longer wanted to speak with" law enforcement. [Tr. at 106–07]. Thus, Defendant did not unequivocally and unambiguously invoke his right to remain silent.

In his reply brief, Defendant argues, for the first time, that he *did* subsequently invoke his right to remain silent when he stated that he "'did not want to say any more than' he was leaving the apartment to help a friend." [Doc. 87 at 7]; <u>see also</u> [Doc. 73 at 19–21]. While the statement that he "[did not] want to say any more" appears unambiguous at first blush, Defendant acknowledges the statement was made in the limited context of Defendant's explanation for "why he was leaving his mother's house at [the] moment [he was arrested]." [Tr. at 96].

An individual has the right to "selectively waive his Fifth Amendment rights by indicating that he will respond to some questions, but not to others." <u>United States v. Lorenzo</u>, 570 F.2d 294, 297–98 (9th Cir. 1978). A person's refusal to answer a

particular question does "not require the cessation of questioning" unless the person makes "a 'clear[ ]' request that all further questioning cease." United States v. Ramirez, 79 F.3d 298, 305 (2d Cir. 1996) (alteration in original). Instead, when a suspect only asks "that the agents not question him as to particular subjects," further questioning is permissible so long as "the federal agents meticulously honored [the] request by steering away from those subject areas." United States v. Soler, No. 05-20652-CR, 2006 WL 8446777, at *3 (S.D. Fla. Feb. 22, 2006), report and recommendation adopted sub nom. United States v. Samsoedien, 2006 WL 8446780 (S.D. Fla. Apr. 19, 2006).

Again, the statement at issue—Defendant's assertion that he "didn't want to say any more than that"—occurred in the context of a discussion regarding "why he was leaving his mother's house" on the day of the arrest. [Tr. at 96]. As Defendant himself acknowledges, this statement can be interpreted as meaning "*that he did not want to talk any further about his actions that day*." See [Doc. 87 at 9] (emphasis in original). Sure enough, the subsequent discussion between Defendant and law enforcement during the ride to the ATF offices properly "steer[ed] away from" any discussion of why Defendant was leaving the home, who he was going to meet, what

his friend wanted from him, etc.  See [Tr. at 90–92, 96–98]; see also Soler, 2006 WL 8446777, at *3.

Defendant also seems to contend that the statement could have meant he wanted to cease all discussion about the case.  See [Doc. 87 at 9] (stating that Defendant told law enforcement he did not want to talk "about his actions that day or the case") (emphasis omitted).  But this argument is contradicted by the fact that Defendant "want[ed] to know a little more" about the crime for which he was arrested, so *he asked* law enforcement for details about "what he allegedly did." [Tr. at 97–98].  If Defendant's statement that he "didn't want to say any more," meant he did not want to discuss *the case* anymore, he would not have peppered law enforcement with questions about the details of the alleged crime immediately after making the statement.  See [id. at 96–98].

It is clear from context that Defendant's statement meant he "*did not want to talk any further about his actions that day*," *i.e.* what he was planning to do that day if he had not been arrested.  See [Doc. 87 at 9] (emphasis in original).  As mentioned above, Officer Palermo was present for the discussion in the car and apparently did not interpret any of Defendant's statements as meaning that "he no longer wanted to speak with" law enforcement. [Tr. at 106–07].  The undersigned finds this testimony credible

because, as explained above, it seems from context that Defendant's statement was not a request to cease all questioning. At a bare minimum, Defendant's statement that he "didn't want to say any more than that" is subject to multiple interpretations. [Tr. at 96]. When a defendant's statement is subject to "two reasonable, competing interpretations," the statement is "the very definition of ambiguity." United States v. Acosta, 363 F.3d 1141, 1155 (11th Cir. 2004) (quoting Doe v. Bush, 261 F.3d 1037, 1062 (11th Cir.2001)). Because Defendant was read a Miranda warning and did not "unambiguously and unequivocally invoke his right to remain silent" during the car ride to ATF offices, his statements to law enforcement during that ride are not subject to suppression. Acosta, 363 F.3d at 1155.[4]

---

[4] As mentioned above, the Government must show that Defendant not only failed to invoke his rights, but that he knowingly and intelligently waived them. See Jones, 32 F.3d at 1516. Although not thoroughly discussed by the parties, the fact that Defendant was read a proper Miranda warning demonstrates that he knew of his rights and the consequences of waiving them. See Gov't Exh. G. Further, the record demonstrates that Defendant was of at least average intelligence because he competently engaged in a discussion with the officers and discussed his "very lucrative" business that made him "up to $50,000 a month." See [Tr. at 106]. Defendant briefly argues he was "[d]isoriented" and had a "lack of understanding," but the evidence cited does not relate to whether he knowingly and intelligently waived his rights. See [Doc. 87 at 12]. Defendant simply asked "about what was going on" and for details regarding his alleged offense. [Tr. at 85, 97–98]. There is no evidence Defendant was confused about his rights, which were adequately explained to him by Officer Fudella.

### 2. *Defendant's Statements at the ATF's Buffalo Offices*

Having decided that Defendant did not unequivocally invoke his right to remain silent prior to arriving at the ATF offices in Buffalo, the question then becomes whether the initial <u>Miranda</u> warning was sufficient or whether Agent Dorman and Norris were required to issue another warning before questioning Defendant.  As a general matter, law enforcement "are not required to rewarn suspects [of their <u>Miranda</u> rights] from time to time." <u>Berghuis</u>, 560 U.S. at 386; <u>see also</u> <u>Shriner v. Wainwright</u>, 715 F.2d 1452, 1456 (11th Cir. 1983) ("[A]n accused does not have to be continually reminded of his <u>Miranda</u> rights once he has knowingly waived them.").  Defendant fails to cite any case where a Court has required the reissuance of a <u>Miranda</u> warning where, as here, the Defendant failed to invoke his right to remain silent or his right to counsel in between the first and second interrogations.  <u>See</u> [Doc. 73, 87].  For the following five reasons, the undersigned concludes that the <u>Miranda</u> warning given to Defendant by Officer Fudella was still effective and thus that the agents who questioned Defendant in the ATF's Buffalo offices were not required to give Defendant a second <u>Miranda</u> warning prior to questioning him.

First, the warning given by Officer Fudella was complete, and Defendant understood it.  <u>See</u> <u>Jarrell v. Balkcom</u>, 735 F.2d 1242, 1254 (11th Cir. 1984).  Second,

during the ride to the ATF offices, law enforcement did not act in a way that "dilute[d] the efficacy of the warning given." United States v. Hopkins, 433 F.2d 1041, 1045 (5th Cir. 1970). As discussed above, Defendant knowingly, intelligently, and voluntarily waived his rights and chose to speak with the officers during the car ride. Defendant's arguments to the contrary are unpersuasive. See [Doc. 87 at 13]. Third, Defendant freely admits that the interrogation "at the ATF office [was] in connection with *the same crime*" that was discussed during the car ride. [Doc. 73 at 21] (emphasis in original); see also Hopkins, 433 F.2d at 1045 (holding that the defendant's initial Miranda warning was sufficient, in part, because the subsequent interrogation "touched upon the same subject matter discussed" during the first).

Fourth, the law enforcement officer who read Defendant the Miranda warning was an ATF agent, and Defendant was explicitly told during the car ride that he would subsequently be questioned by other ATF agents. [Tr. at 85–86, 90]. Thus, there is no concern that Defendant was confused as to whether the rights read to him by one ATF agent would apply to the subsequent questioning by other ATF agents. Cf. Hopkins, 433 F.2d at 1045 (holding that the Miranda warning given by a federal officer was still effective during questioning by a state officer even though the defendant argued he

"assumed that his privilege with respect to state interrogations was not co-extensive with that against federal questioning").

Fifth, the gap in time between the initial <u>Miranda</u> warning and the questioning at the Buffalo offices was not long enough to render the warning stale.  As Defendant acknowledges, the drive to Buffalo took approximately twenty to thirty minutes, and Defendant was then questioned again at the Buffalo offices "[i]n short order."  [Doc. 73 at 21]; <u>see also</u> [Tr. at 107].  Where the subsequent "interrogation occurred on the same day and the only break in his questioning came as a result of his transportation," a second <u>Miranda</u> warning is unnecessary.  <u>Ballard v. Johnson</u>, 821 F.2d 568, 572 (11th Cir. 1987); <u>see also</u> <u>United States v. Andaverde</u>, 64 F.3d 1305, 1312 (9th Cir. 1995) (holding the defendant's confession one day after a <u>Miranda</u> warning was still voluntary because the defendant must have known that his rights had not materially changed simply because he had changed location and faced a new interrogator); <u>Stumes v. Solem</u>, 752 F.2d 317, 320 (8th Cir.1985) (holding that the passage of five hours by itself was not sufficient to invalidate the defendant's initial waiver of his rights).

Two facts weigh in Defendant's position that the initial <u>Miranda</u> warning was no longer effective.  First, Agents Dorman and Norris failed to inquire, with either Defendant or the other law enforcement officers, regarding whether Defendant had

already been read a Miranda warning.  See [Tr. at 23–25, 92].  Second, after being read a second Miranda warning, Defendant promptly invoked his right to counsel.  [Id. at 25–26].  But considering the totality of the circumstances, the undersigned concludes that  the Miranda warning given to Defendant by Officer Fudella was sufficient such that the agents who questioned Defendant in the Buffalo offices were not required to give Defendant a second Miranda warning prior to questioning him.

As discussed above, Defendant knew and understood his rights and willingly spoke with law enforcement during the ride to the Buffalo offices.  Defendant understood that his arrest—and initial Miranda warning—related to "a firearms case" and that he would be subject to more questioning once he arrived at the ATF offices.  See [Tr. at 90].  A relatively short amount of time elapsed between the car ride and Defendant's subsequent questioning by the ATF agents who Defendant knew "would have more questions for him."  See [id.].  Under the circumstances, Defendant clearly understood that the rights read to him as part of the initial Miranda warning still applied during the subsequent interrogation.  The fact that the agents did not ask Agent Fudella whether he read Defendant a Miranda warning does not diminish Defendant's own understanding of his rights.  Moreover, the fact that Defendant later invoked his right to counsel does not persuade the Court that Defendant failed to understand he had

a right to have an attorney present during questioning.  It is equally plausible that Defendant had already had his fill of discussing the case.  As Defendant earlier stated, "he didn't want to talk too much about the case."  [Tr. at 87].

Once Defendant unequivocally and unambiguously invoked his right to have counsel during questioning, the interrogation ceased.[5]  Based on the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress his statements to law enforcement ([Doc. 54]) be **DENIED**.[6]

## CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's first Motion to Suppress ([Doc. 53]) be **GRANTED in part and DENIED in part** and

---

[5] Defendant notes that Agent Dorman asked Defendant "if he had any questions" after Defendant invoked his right to counsel.  See [Doc. 73 at 6].  Defendant, however, does not argue that this questioning violated his constitutional rights for a number of reasons.  First, it does not appear Defendant made any subsequent statements that possibly could be suppressed.  Second, the question was not "interrogation" because it was not "reasonably likely to elicit an incriminating response."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  Agent Dorman explicitly limited his question to "any questions [that were] *not case related*."  [Tr. at 54-55] (emphasis added).

[6] Because the undersigned concludes that Agents Dorman and Norris did not need to provide Defendant a second Miranda warning prior to questioning him, this Report and Recommendation does not address the Government's argument that the questioning was subject to the so-called "book-in exception."  See [Doc. 81 at 20-21].

that his second Motion to Suppress ([Doc. 54]) be **DENIED**.  Specifically, the undersigned **RECOMMENDS** that the out-of-court identification by Ms. Weeks be suppressed and that any in-court identification be excluded as well.  However, the undersigned further **RECOMMENDS** that Ms. Dickerson's identification not be suppressed and that Defendant's Motion to Suppress his statements to law enforcement be denied in its entirety.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.  **IT IS FURTHER ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED, REPORTED, AND RECOMMENDED**, this  14   day of September, 2020.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

33